**Laura KELBER, Plaintiff–Appellant,**

v.

**JOINT INDUSTRY BOARD OF the ELECTRICAL INDUSTRY, Defendant–Appellee.**

**No. 1113, Docket 93–7843.**

United States Court of Appeals, Second Circuit.

Submitted Feb. 3, 1994.

Decided June 17, 1994.

Raymond L. Mariani, New York City (Katten Muchin & Zavis, of counsel), filed a brief for plaintiff-appellant.

Edward Cherney, New York City (Douglas D. Menagh, Menagh, Trainor, Mundo & Falcone, P.C., of counsel), filed a brief for defendant-appellee.

Before OAKES, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Laura Kelber appeals from an adverse judgment in her civil rights suit following a jury trial. Kelber is a female electrician, a college graduate and mother of three young children. She sued the defendant, Joint Industry Board of the Electrical Industry (Joint Board), which operates a hiring hall for electricians seeking work assignments, on the grounds that in June 1989 the defendant discriminated against her on account of her pregnant condition. The discrimination she

alleges consisted of defendant's assigning her to worksites unsuitable for a pregnant woman.

In her first complaint filed in her discrimination suit Kelber, a member of Local 3 of the International Brotherhood of Electrical Workers, alleges that when she became pregnant in 1989 the Joint Board refused to assign her a job. Kelber also brought a second suit against the Joint Board for retaliation. She asserts that when she brought her first suit against the Joint Board for pregnancy discrimination, it either refused her work assignments or assigned her unsuitable work as punishment.

The two suits, both brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17 (1988 & Supp. IV 1992), and under the New York State Human Rights Law, N.Y.Exec.Law §§ 290–301 (McKinney 1993), were consolidated for trial, which was held in May 1993 in the United States District Court for the Eastern District of New York before Judge Arthur D. Spatt. After the jury returned answers to special jury questions favorable to the defendant, the district court entered a judgment for the defendant on July 15, 1993 dismissing plaintiff's two complaints. On the same day, the district court denied plaintiff's motion for judgment as a matter of law or alternatively for a new trial. From this judgment and order, Kelber appeals.

## BACKGROUND

### A. *Civil Rights Law*

Because this is a civil rights employment suit, we must look to the statute that makes it an unlawful employment practice "to limit, segregate, or classify ... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [an employee's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2) (1988). The definitions section of the civil rights law defines the terms "because of sex" or "on the basis of sex" to include pregnancy, childbirth, or related medical conditions. *See* 42 U.S.C. § 2000e(k) (1988). The legislative history further makes clear that at the root of discrimination against pregnant women is the impression that once pregnant they will leave the labor force, which results in a view of women as marginal workers preventing them from receiving equal treatment in employment. *See* H.R.Rep. No. 948, 95th Cong., 2d Sess. 3 (1978), *reprinted in* 1978 U.S.C.C.A.N., 4749, 4751.

Of the several issues raised on appeal, one relates to the district court's exclusion at trial of public testimony given, prior to plaintiff's trial, by one of defendant's key decisionmakers concerning the role of women in the electrical industry. In it he suggested that women who experienced sexual harassment on a jobsite should either ignore it or take another job and, he continued, he thought the Joint Board would be justified in failing to assign a woman who complained repeatedly about incidents of sexual harassment at the worksite. We think it now settled beyond doubt that one aim of the civil rights laws is to free working women from the shackles of outworn prejudices that for too long have been firmly clamped upon the body of the law.

### B. *Joint Board's Assignment Procedures*

We examine the facts. It is helpful to an understanding of this case to relate briefly the general procedures the Joint Board follows in the operation of its hiring hall. The Joint Board is an association between Local 3 and various electrical contractors created pursuant to the collective bargaining agreement between the union and the employers. It is composed of 31 members, 15 members from the contracting industry, 15 members from the union, and one public member. The policy of the Joint Board and the seven person Joint Employment Committee, which oversees and administers the Joint Board's Employment Department and its hiring hall, is to attempt to accommodate employers and those Local 3 members who apply at the Joint Board's employment office for work. Specifically, its principal role is to receive electrical contractors' requests for electricians and then to assign Local 3 electricians to the open positions.

The individual in charge of this operation is Robert McCormick who has served for over 20 years as the employment director of the Joint Industry Board. When an electrical contractor telephones a request, one of the people on McCormick's staff makes out a job order form, which sometimes describes the type of work available and sometimes does not. By the same token, when an electrician comes to the employment office seeking work, he or she fills out a questionnaire form. It is McCormick's sole responsibility to make work assignments. He testified that the assignments are made on a first-come, first-served basis. When the demand from employers is great and electricians are scarce, McCormick draws from the job order forms stacked on his desk, with the oldest one on top. Similarly, when electricians seeking employment are plentiful and jobs are not, the person waiting the longest in the category of apprentice or journeyperson level electrician is offered the next available job in that person's category.

The exceptions to the first-come, first-served policy include situations where special skills—for instance, a high voltage or high tension cable splicer—are sought; or where the applicants for work specify they do not want to be assigned at night or to high places. Another exception to the first-come, first-served rule is the so-called "bad" layoff, i.e., where the contractor is dissatisfied with a particular employee and terminates that person. When an electrician receives a "bad" layoff the employment office does not send that particular employee back to the same contractor, nor will the employee be sent to any job while the circumstances surrounding the layoff are being investigated. In contrast, a "good" layoff is one where the contractor reduces its work force of electricians because of insufficient work. There are no adverse assignment effects from such a layoff, rather the employee just reenters the job pool.

Yet another exception to the first-come, first-served rule—one that is critical in this case—occurs when electricians are seeking less strenuous work. These so-called "light duty" job assignments are not defined. Instead, a list is maintained of jobs that contractors themselves identify as "light duty." It is idiosyncratic to the extent that each contractor determined what it viewed as "light work." Obviously, what one contractor thought was "light work" might not be so considered by another contractor. In any event, the Joint Board maintained a separate, and much shorter list than the regular job order forms—made up from contractors' requests for electricians—of the so-called "light duty" jobs. The procedures described above were testified to by McCormick, but he admitted there were no written description of these procedures available for inspection by Local 3 members, nor were they outlined at Local 3 membership meetings.

## C. Kelber's Failure to Get an Assignment

Having these hiring hall procedures in mind, we set forth what plaintiff claims she experienced as a pregnant female electrician, a group that constitutes a very small minority of Local 3's membership. Kelber reached the level of journeyperson in 1986, following a four-year apprenticeship and a two-year stint as an intermediate journeyperson. The principal dispute about the treatment accorded her arises after plaintiff announced her pregnancy in June 1989. At that time, she was working on a project that involved heavy lifting and exposure to construction dust. Because the contractor could not accommodate Kelber's request for different work, she received a reduction of work force or good layoff. Kelber then reported to the hiring hall to request a new assignment. Coupled with her request, she included a letter from her nurse/midwife recommending that she be placed "on light duty."

It is apparent that the note intended the words light duty to connote easier work in the sense a layperson would understand, that is, to ease the burden of work at least in part. According to the Joint Board procedures outlined above, "light duty" is a type of work designated specifically by contractors seeking electricians. As a result of this Joint Board policy the number of job opportunities for Kelber was dramatically cut. Kelber maintains that the letter she submitted with her request for a new assignment was simply meant to limit whatever assignment from the

regular job order list she might obtain to those types of regular jobs that entailed easier work. In the past, Kelber points out, she had received jobs taken from the regular list suitable for her condition.

In the summer and fall of 1989 plaintiff was sent to several contractor-defined "light duty" jobs, which she refused for various reasons: two were for night work, another was inaccessible by public transportation (she has no car or license to drive) and in any event would have required her to do heavy lifting, work in an unventilated room where the temperatures would exceed 100 degrees, and work in the midst of toxic waste. During this time, plaintiff says she attempted to arrange a meeting with employment director McCormick, to straighten out the *light duty* misunderstanding. But she was never able to meet him to discuss the situation.

## PRIOR PROCEEDINGS

In July 1989 Kelber filed a complaint with the Equal Employment Opportunity Commission (EEOC) against the Joint Board alleging pregnancy discrimination. The EEOC issued a "right to sue" letter. Appellant declares that after she filed her complaint she did not receive timely assignments off the "light duty" list. In November 1989 she went on maternity leave and in June 1990 commenced the instant action. In addition to her claim of pregnancy discrimination, in December 1992 Kelber filed a second complaint asserting a cause of action based on ongoing retaliatory treatment. Both claims are premised on Title VII, 42 U.S.C. §§ 2000e–2000e–17, and are coupled with identical claims under New York Human Rights Law, N.Y.Exec.Law § 290–301.

At the trial, the district court judge gave the jury special interrogatories corresponding to the elements of Kelber's pregnancy discrimination and retaliation causes of action. Interrogatory One, relating to pregnancy discrimination, asked: "Did the plaintiff LAURA KELBER establish, by a preponderance of the evidence, that the defendant Joint Industry Board failed to offer the plaintiff appropriate available 'light duty' jobs during the summer of 1989?" The jury answered this question "No." It did not therefore answer any of the other questions concerning plaintiff's pregnancy claim and

was advised on the verdict sheet that a "No" answer was a verdict for the defendant Joint Board on that claim.

The jury was then instructed by the verdict sheet instructions to proceed to Interrogatory Five, relating to the retaliation claim, which asked: "Did the plaintiff LAURA KELBER establish, by a preponderance of the evidence, that the defendant Joint Industry Board failed to offer plaintiff certain available jobs after she initially complained of pregnancy and sex discrimination?" After the jury answered "No" to this question, again finding in favor of the Joint Board, it did not answer the other interrogatories concerning retaliation. Plaintiff, as noted, unsuccessfully moved after the unfavorable jury verdict, pursuant to Fed. R.Civ.P. 50(b) and 59, for entry of judgment in her favor as a matter of law, or in the alternative for a new trial.

## DISCUSSION

Several issues are raised on appeal, only two of which warrant discussion. The first, and most significant challenge, relates to the district court's instructions on the pregnancy discrimination claim; the other issue relates to evidentiary rulings made by the district court judge during the course of the trial.

### I Jury Instructions

█ In reviewing the trial court's instructions, we look at the instructions as a whole to determine if they gave a misleading impression or inadequate understanding of the law. See *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir.1993); *Plagianos v. American Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir.1990) (per curiam). It must be remembered that a litigant is entitled to have the jury fairly instructed with respect to her claims. If the charge actually given were correct and sufficiently covered the essential issues, we would be disinclined to upset the jury verdict. See *BAII Banking Corp.*, 985 F.2d at 696.

█ Here plaintiff declares that the district court erred in refusing to instruct the jury on two theories on which her case rested. First, the trial judge declined to give an instruction based on the Joint Board's failure to assign Kelber jobs under the regular sys-

tem because of her pregnancy. Defendant responds that Kelber was not in the regular system, but was on the "light duty" system. Second, and most critical, the trial court would not give an instruction based on the Joint Board's failure to explain the "light duty" system to her. Instead, the trial judge charged the jury that plaintiff was required to prove, notwithstanding her pregnant condition, that she was able to perform the available jobs "which were identified as light duty by electrical contractors requesting assignment of journey level electricians from the defendant's employment department."

Plaintiff's counsel during the proceedings at the close of the evidence and before the summations or the trial judge's charge to the jury explained that: "[T]here is [a] genuine issue of fact stated with regard to the claim of the employment office's failure to advise the plaintiff what the light duty list meant and not avail her of an option to seek other work, namely, the 29 or so items she had listed." Plaintiff testified that she had no idea that the Joint Board had a formal definition of "light duty," and that when she asked for light work she would be locked into the contractor's definition of it. She thought she would get an assignment to a job reasonably consonant with her pregnant status, not one with heavy or severe working conditions. She made a list of 29 things she could do, for example, wire pulls, splicing, wire mold, floor mold, exit lights, speaker wire hookups, tie-in panels, telephone cables and the like. She wanted to give this list to McCormick, but he refused to see her.

It thus appears that after announcing her pregnant condition to defendant, plaintiff requested light work, as would commonly be understood, suitable for a woman with child. Defendant's definition of "light work," from which it derived its "light duty" work assignment list, consisted of those requests from contractors which stated that an electrician was needed for "light work." Plaintiff was assigned work from this list. Between plaintiff's idea of suitable light work for a pregnant woman and the reality of "light duty" in defendant's assignment list there existed a vast chasm of misunderstanding, which try as she would, plaintiff was unable to bridge.

■ A plaintiff's claims and theories of law, if supported by the evidence and brought to the attention of the trial court, should be given to the jury. *See Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991). In the present case the district court knew of plaintiff's theory on light duty, but refused to explain the difference between plaintiff's view and defendant's view of this significant term. That is to say, the trial court also failed to explain this factual misunderstanding to the jury and let that body resolve whether the Joint Board's failure to explain the difference to Kelber constituted discrimination. Instead, as noted, it charged the jury that "light duty" meant what defendant said it did. Because the jury instructions taken as a whole gave the jury a misleading impression of plaintiff's claims, a new trial is warranted. *See Plagianos v. American Airlines, Inc.*, 912 F.2d at 59.

## II  Evidentiary Rulings

■ Plaintiff contends further that several evidentiary rulings either individually or cumulatively constituted an abuse of the trial court's discretion. She asserts that two other female electricians were not permitted to testify regarding the jobs they were offered while they were pregnant. The district court, after entertaining an offer of proof, refused to admit their testimony because it was not relevant. One witness had been an apprentice while on the "light duty" list and one a trainee. Because the number of "light duty" jobs for women apprentices and trainees was almost nonexistent, the fact that the Joint Board had no jobs to offer these two women had little or no bearing on the issues presented by plaintiff who was in a higher category, as a journeyperson electrician. Thus, we do not think this ruling can be said to be "manifestly erroneous." *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir. 1993).

■ Next, Kelber declares it was error to refuse her request to call Thomas Van Arsdale, one of the members of the Joint Board's Employment Committee that oversees the Joint Board's Employment Department, *i.e.*, the hiring hall. Van Arsdale was the business manager of Local 3 and a member of the Joint Industry Board. He had previously testified, as already noted, prior to the

trial of this case before the New York Human Rights Commission that the Joint Board stopped assigning to new jobs, those women who frequently complained of sexual harassment. The trial judge denied plaintiff's counsel an opportunity to explain why he believed Van Arsdale's testimony was material, cutting him off in mid-sentence. Because Van Arsdale's testimony goes to the Joint Board's motive for failing to assign plaintiff a suitable job after she became pregnant, it was relevant and should be received on the new trial that we are directing. The other challenges to evidentiary rulings are all without merit and require no discussion.

## CONCLUSION

For the reasons stated insofar as the judgment of the district court denied plaintiff a new trial, it is reversed and the case is remanded for a new trial in accordance with this opinion.