**RAND–WHITNEY CONTAINER-
BOARD LIMITED PART-
NERSHIP, Plaintiff**

v.

**TOWN OF MONTVILLE and Town of
Montville Water Pollution Control
Authority, Defendants**

No. CIV. 3:96CV413 (HBF).

United States District Court,
D. Connecticut.

Sept. 30, 2003.

Andrew J. Brand, Susan Mara Phillips, Suisman, Shapiro, Wool, Brennan, Gray & Greenberg, New London, CT, for Town of Montville.

Celia Eggert, Law Offices of Larry R. Levine, Hartford, CT, Daniel L. Goldberg, Ben M. Krowicki, Andrew C. Phelan, Ann M. Siczewicz, Bingham McCutchen, Boston, MA, for Rand–Whitney Containerboard Ltd. Partnership.

Dina S. Fisher, Edward F. Hennessey, Robert Stephen Melvin, Robinson & Cole, Hartford, CT, Paul M. Geraghty, Barbara M. Quinn, Andrews Cosgrove Young, New London, CT, for Montville Water Pollution Control Authority.

Carmel A. Motherway, Attorney General's Office, Hartford, CT, for Dept. of Environmental Protection.

### RULING ON PLAINTIFF'S MOTION FOR JUDGMENT, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL [DOC. # 299]

FITZSIMMONS, United States Magistrate Judge.

## I. INTRODUCTION

This ruling addresses post-trial motions from a case tried to a jury from July 15 through August 9, 2002. Disputes arose under agreements entered into by the parties to develop and operate a $110 million manufacturing plant in the Town of Montville. The Town undertook to supply the plant with water of a defined quality, necessary for the plant's operation, and to treat the plant's effluent through its municipal waste treatment system. From the beginning of plant operations, the Town was unable to supply water of the specified quality. Specifically, the level of Total Dissolved Solids ("TDS") in the municipally supplied water exceeded the contractual standard. The Town attributed its inability to comply to its difficulties in treating the plant's effluent, as the Town's system involved recycling the plant's wastewater through the treatment facility and back to the plant.

For several years, the parties worked together to develop alternative methods of supply and treatment. The agreed upon technological solution—to separate the waste streams and treat and dispose of the plant effluent separately from municipal waste water—was thwarted when the Connecticut Department of Environmental Protection ("DEP") denied the necessary permits.

This trial followed, with the Town claiming that it was fraudulently induced to enter into the Supply and Treatment Agreements by misrepresentation as to the quality of the plant's effluent, and the plant operator seeking damages for various breaches of the agreements.

As articulated in the responses to interrogatories submitted to it, the jury found that defendants proved, by clear, precise, and unequivocal evidence, their fraud counterclaim and affirmative defense, and proved, by a preponderance of the evidence, that plaintiff breached the covenant

of good faith and fair dealing in the Supply and Treatment Agreements. [Jury Interrogatories, doc. # 248.] More specifically, with respect to their fraud defense and counterclaim, the jury found that defendants proved, by clear, precise, and unequivocal evidence, that: (1) they relied on a representation from plaintiff regarding water quality; (2) they were induced to enter into the Supply Agreement by that representation; (3) plaintiff made that representation with intent to deceive and regarding a belief that it did not in good faith entertain; and (4) the representation proved untrue. [*Id.*, Nos. 1–4.] With respect to the covenant of good faith and fair dealing, the jury found that defendants proved, by a preponderance of the evidence, that a covenant of good faith and fair dealing applied at the time of, and with respect to, the negotiations leading to the June 29, 1993 Supply and Treatment Agreements, that plaintiff breached that covenant, and that defendants had suffered at least some damages.[1] [*Id.*, Nos. 21–23.] The jury also found that plaintiff proved, by a preponderance of the evidence, that defendants breached the Modification Agreement with respect to Service Fees, as well as damages in the amount of $344,872. [*Id.*, Nos. 15–16.] [2]

Plaintiff now moves for judgment as a matter of law, or, in the alternative, for a new trial. [Doc. # 299.] Plaintiff argues that: (1) defendants failed to prove every element of their fraud claim and defense, and, in fact, ratified the very agreements they challenged; (2) the court improperly instructed the jury on finding fraudulent intent, and on the covenant of good faith and fair dealing; and (3) defendants not only failed to prove every element of their

claim regarding the covenant of good faith and fair dealing, but they never even pleaded such a claim. [*See generally id.*] Defendants disagree with all of plaintiff's arguments, and argue additionally that plaintiff waived its ratification argument by failing to plead it as an affirmative defense.

## II. STANDARD OF REVIEW

The parties substantially agree on the appropriate standard of review.

▆▆▆ A motion for judgment as a matter of law is brought pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. The standard under Rule 50 is similar to the standard for summary judgment under Rule 56. In reviewing a motion for judgment, the court must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor. *See Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993). Thereafter, a court may enter judgment as a matter of law only if: (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture; or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded jurors could not arrive at a verdict against the movant. *See Ahern v. County of Nassau*, 118 F.3d 118, 120 (2d Cir.1997). The court may not weigh the credibility of the witnesses or evaluate the weight of the evidence. *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir.1999). Moreover,

---

1. The court severed the issue of defendants' damages. That issue has not yet been tried.

2. The jury also found that these damages constituted a clearly established obligation due and owing to plaintiff that was wrongfully detained by defendants. [Doc. # 248, No. 17.]

since a grant of a motion for judgment would essentially deprive the party of a determination of the facts by a jury, it should be cautiously and sparingly granted. *See Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 59 (2d Cir.1993).

■ A post-trial motion for judgment under Rule 50 is a renewal of an earlier motion made at the close of the evidence, and can be granted only on grounds advanced in the pre-verdict motion. Fed. R.Civ.P. 50 advisory committee's note (re 1991 Amendment, Subdivision (b)) (citing *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614 (3d Cir.1989)). It cannot assert new grounds; the rules limit the grounds for post-verdict judgment as a matter of law to those "specifically raised" in the pre-verdict motion. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir. 1993) (citations and internal quotations omitted).

■ A motion for a new trial is brought pursuant to Rule 59 of the Federal Rules of Civil Procedure. Under that rule, a motion for new trial should not be granted unless, in the opinion of the district court, the jury has reached a seriously erroneous result, or the verdict is a miscarriage of justice. *See Song v. Ives Labor., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). Unlike a motion for judgment, a new trial may be granted even if there is substantial evidence supporting the verdict, and the court is free to weigh the evidence. However, a new trial should be granted only if the jury's verdict is egregious. *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir.1998). As the Court of Appeals has warned, a jury's verdict should rarely be disturbed. *Peggy Farrior v. Waterford*

*Board of Education*, 277 F.3d 633, 635 (2d Cir.2002). The decision to grant a new trial is "committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992).

### III. *STATEMENT OF RELEVANT FACTS*

This case has a long history with the court, and the facts have been recited on several occasions.[3] Following is a summary of the relevant background facts necessary for understanding this decision. To the extent the factual evidence offered at trial impacts this court's decision, and that evidence is not included here, it will be described in the relevant portion of the Discussion section.

Rand–Whitney Containerboard Limited Partnership ("plaintiff" or "Rand–Whitney") owns a plant in Montville, Connecticut, which converts old corrugated cardboard into linerboard. It began operation in January 1995. One defendant, the Town of Montville ("the Town" or "Montville") is a public instrumentality and subdivision of the State of Connecticut. The other defendant, the Water Pollution Control Authority ("WPCA"), is an administrative subdivision of the Town of Montville, organized and existing under the laws of Connecticut.[4] It is responsible for, among other things, supervising and maintaining the wastewater treatment facility for Montville.

Rand–Whitney's plant ("the Mill") produces paper linerboard, used to manufacture corrugated cardboard boxes, from two essential ingredients: old corrugated containers and water. To secure the needed water supply, Rand–Whitney signed a con-

---

3. *See, e.g.*, Ruling on Pl.'s Mot. Summ. J. (doc. # 106) (docketed 03/04/02).

4. Unless a distinction between the two defendants is necessary, the court may also refer to the defendants collectively as "the Town" or "Montville."

tract with defendants which, in its amended form, is called the Second Amended and Restated Water Supply Agreement dated as of June 1, 2002, amended and restated as of January 4, 1993, and further amended and restated as of June 29, 1993. This "Supply Agreement" defines "Treated Water" as water that meets certain contractual quality standards set forth in Schedule 1.1 of the Supply Agreement, including maximum limits for Total Dissolved Solids ("TDS") and other substances.

The term "TDS" describes certain organic and inorganic chemical substances that are present in water in dissolved form. Standard laboratory tests are used to measure the amount of TDS in water. The test involves filtering the water to remove suspended (i.e., non-dissolved) solids, then evaporating the water and weighing the amount of residue remaining. The amount of TDS measured in a water sample is typically reported as milligrams (of TDS) per liter (of water) and expressed as "mg/l."

Schedule 1.1 requires that the TDS level in the Treated Water that the WPCA supplies to the Mill not exceed a Maximum Concentration Limit of 500 milligrams per liter ("mg/l") and a monthly Maximum Average Concentration Limit of 353.66 mg/l.

Section 10.1(a) of the Supply Agreement states, in part, that the failure by the WPCA to deliver Treated Water in accordance with the provisions of the Supply Agreement is an "Event of Default."

The Mill began commercial operations in January 1995. Since its start-up in the first quarter of 1995, the Mill has generally operated twenty-four hours per day, seven days per week. During that time, the volume of water used by the mill has remained relatively constant: on average, approximately one million gallons of water per day.

For reasons related to the quality of water available from defendants, Rand–Whitney has obtained substitute water for the Mill from the Oxoboxo River, whenever possible, for (1) boiler use beginning in 1995, (2) temporary process use during the first quarter of 1997, and (3) process use beginning in October 1997.

Under the terms of a water diversion permit issued by the Connecticut Department of Environmental Protection ("DEP") in October 1997, Rand–Whitney is permitted to divert up to approximately 800,000 gallons per day of water from the Oxoboxo River when the flow of that river is above a threshold level set forth in the permit.

Whenever the river flow is lower that the threshold (usually in July, August, and September), the DEP permit allows Rand–Whitney to take only a maximum of 120,000 gallons per day from the Oxoboxo River. Since obtaining the diversion permit, and depending on the river flow level, Rand–Whitney has used up to the maximum amount of water from the Oxoboxo River allowed by the permit. The amount of water the Mill has obtained from the WPCA under the Supply Agreement has been reduced in direct proportion to the amount of water obtained from the Oxoboxo River.

After being used in the manufacturing processes, Rand–Whitney's wastewater has been, and is, returned to the WPCA under the terms of a "Treatment Agreement."

All of the disputes between these parties in this case arise out of, or relate to, the Treatment Agreement, which allows Rand–Whitney to discharge its plant's waste water into the publicly owned treatment facility owned and operated by Montville, and the Supply Agreement, which requires the Town to supply certain quan-

tities of treated water for use by Rand–Whitney in its production of linerboard.

## IV. DISCUSSION

### A. Defendants' Fraud Defense and Counterclaim

Prior to trial, this court granted partial summary judgment in favor of plaintiff on its claim that defendants breached the Supply Agreement by failing to provide water within the TDS (total dissolved solids) limits required by that Agreement. In that ruling, the court permitted a single defense to liability—that defendants were fraudulently induced to enter into the Supply Agreement (which contained the TDS limits) by plaintiff's knowingly false representation that the quality of the effluent of the new mill would be the same as or similar to the effluent released by the then-existing mill (the Robertson facility). Defendants also alleged a fraud counterclaim based on the same facts.

Plaintiff challenges defendants' proof on every single element of defendants' fraud defense and counterclaim.[5] First, plaintiff argues that defendants failed to prove by clear, precise, and unequivocal evidence that plaintiff made a false representation that it did not in good faith entertain, because there was no evidence that the statements about the similarity of the effluent were false and no evidence that the statements were made without a good faith

belief in their truth. Second, plaintiff argues that defendants failed to prove that they relied on the representations that the new mill's effluent would be similar to the Robertson effluent. Third, plaintiff argues that defendants failed to prove that defendants' decision-makers were induced to enter into the June 1993 Agreements by any alleged reliance on the similarity statements.[6] Additionally, plaintiff argues that defendants' fraud defense and counterclaim are barred as a matter of law because defendants ratified the Supply and Treatment Agreements when they executed the Modification Agreement in 1996. Because the court finds no evidence of reliance, and thus that plaintiff is entitled to judgment as a matter of law on defendants' fraud defense and counterclaim, the court need not address plaintiff's remaining arguments.

### 1. Reliance

#### a. Definition

The first question is: what is reliance? The parties each have a different interpretation of the term. Plaintiff seems to interpret it as some measure of dependence on the statement that was made, with the information conveyed in the statement playing some role in influencing the listener's subsequent actions. Defendants, however, equate reliance with injury, or acting

---

**5.** As the court instructed the jury, the only additional element that defendants were required to prove for their counterclaim (over and above the elements of the defense) was the fact of damages. The jury found that defendants proved, by a preponderance of the evidence, that defendants suffered damages as a result of plaintiff's fraudulent misrepresentation. [Doc. # 248, No. 20.] Although, in the context of disputing every element of defendants' claim, plaintiff challenges the jury finding on the existence of damages, the court disagrees. Given that the court severed the issue of the amount of defendants' damages,

the lesser burden of proof regarding damages, and the clear evidence that defendants made various technical, legal, and political efforts to test, treat, and/or correct the TDS levels in the water, the court finds no error in the jury's response to Interrogatory No. 20. Therefore, the court addresses the sufficiency of the evidence supporting the fraud counterclaim and defense simultaneously.

**6.** Plaintiff also argues that any actual reliance or inducement was unreasonable as a matter of law.

to one's injury.[7] Black's Dictionary defines "reliance" in the fraud context as "a belief which motivates an act," but adds that reliance "need not be the sole or even dominant reason for acting if it was a substantial factor in the [listener's] decision." Black's Law Dictionary (6th ed.) at 1291.

█ In its jury instructions, the court allowed the jury to apply the commonsense definition of reliance, but implicitly recognized both a "belief" factor and a "motivation" factor. [*See* Jury Charge at 43–45.] The court explained the "induced to enter"[8] element as focusing more on actions taken by the listener—a definition which also included a "motivation" factor. Reading these sections of the charge together, as one must, the jury was instructed that reliance constituted a belief in and dependence on a statement, which was a substantial factor motivating a decision to act, while the "induced to enter" element focused on the action taken as a result of that motivation. As applied to the facts of this case, reliance would be defendants' belief in and dependence on plaintiff's representation regarding the quality of the future effluent, while the "induced to enter" prong would be satisfied by defendants' entering into a contract to return a quality of water that could not be returned unless plaintiff's representations were true. With that understanding of the term "reliance"—an understanding more closely resembling plaintiff's definition than defendants' definition[9]—the court must now ad-

7. Indeed, in defendants' opposition brief, they do not even include a section on "reliance." Defendants quote the general elements of a fraud claim from *Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811 (1981): "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." [Def.s' Opp. at 26.] While the quotation is accurate, defendants overlook the numerous refinements and articulations to the definition of fraud, as the court has applied that definition to the facts and allegations in this case (i.e., that the representation was an opinion—whether based in known facts or not—as to future matters). See this court's Ruling on Motion for Judgment on the Pleadings (doc. # 201), filed July 12, 2002, for a detailed description of the elements of defendants' fraud defense and counterclaim. It was that definition that was charged to the jury (*see* Jury Charge at 36), and which is relevant to this motion; defendants survived judgment on the pleadings based on this "different" kind of fraud claim [*see* Ruling on Pl.'s Mot. for J. on Pleadings (doc. # 201) at 2–3].

8. Distinguishing "reliance" and "inducement" is confusing because those concepts address the same thing from two different perspectives. More appropriately, and as framed to the jury [doc. # 248 at ¶ 2], the latter term should be replaced by the phrase "induced to enter"—which accurately incorporates both the action and the motivation.

9. Defendants reiterate their definition in their "Post-Hearing Submission" [doc. # 314]. Although worded differently from the court's instructions to the jury, the substance is similar. Defendants' "inducement" prong resembles the court's "reliance" formulation, and defendants' "does so act" prong is very similar to the court's "induced to enter" language. However, to the extent defendants argue that the law merely requires that plaintiff had the *intent* to induce, and that defendants "coincidentally" committed the act, the court disagrees. That position omits the necessary causation element described in the jury charge. Whether termed "reliance" or "induced to enter," defendants were required to prove a causal connection between the statement and the subsequent act. It is not enough that a statement was intended to induce an act, and that the other party happened to so act; the statement must have actually induced the act. Inherent in the concept of inducement is that the listener actually relied on the truth of the statement in so acting. It is *that* element addressed by this ruling. In other words, the statement must have been intended to induce the act, and reliance on the truth of the statement must have actually induced the action.

dress whether there was evidence of defendants' reliance sufficient to support the jury's verdict.

b. *Applying the Definition to the Evidence*

■ At trial, Rand–Whitney called Tom Bowen to testify. Bowen was the superintendent of Montville's publicly owned treatment works ("POTW"). He was the only person who negotiated for the town the technical water-quality aspects of the Supply and Treatment Agreements. [Bowen Tr., 7/27/02, at 177 [10]; Bowen Tr., 7/19/02, at 192–93; Cobery Tr., 7/17/02, at 68.] There was no evidence that anyone else represented defendants in those technical negotiations or in determining whether defendants could supply the quality of water that plaintiff needed. There was no evidence that any other town official, or any other representative of defendants, was even aware of the "similarity" representations. There was evidence only that Bowen recommended to town decision-makers that defendants enter into the Supply Agreement with plaintiff. [*See generally* Bowen Tr., 7/19/02 at 192–96; Bowen Tr. 7/22/02, at 146–47.] Therefore, the issue is *whether Bowen*, acting as POTW superintendent for defendants, *relied* on a representation from plaintiff— that the quality of effluent discharged by the new mill would be the same as, or similar to, the effluent of the old plant—in recommending that defendants enter into the Supply Agreement. [*See* Jury Interrogatories (doc. # 248), No. 1.]

The court has carefully and exhaustively scrutinized the trial record. It contains *no* evidence that Bowen relied on plaintiff's representations regarding the quality of the future effluent.

First, Bowen specifically testified that he did not rely on plaintiff's representations:

Q. [By Mr. Krowicki:] And as you sit here today, in advising the Town that it could enter into the treatment agreement, did you ever rely on anything said by [plaintiff's representatives] [11] without checking it out first?

A. [By Mr. Bowen:] No. I went forward and did the research on it to make sure it was—we could treat. . .

\* \* \* \* \* \*

Q. [By Mr. Krowicki:] And in your advising the Town that they could enter into the supply agreement, did you rely on anything that was said to you by [plaintiff's representatives] without checking it out yourself?

A. [By Mr. Bowen:] No, I did not . . .

\* \* \* \* \* \*

Q. [By Mr. Krowicki:] . . . in terms of advising [defendants], was it ultimately you who advised [defendants] that insofar as the technical aspects of the supply agreement and the treatment agreement went, the technical aspects, that the Town could comply with its obligations?

A. [By Mr. Bowen:] Yes, I do.

Q. [By Mr. Krowicki:] And, in terms of advising the Town of those facts and

---

**10.** The court will refer to testimony by the last name of the witness testifying, the date of that testimony, and the page of that day's transcript on which the testimony can be found (i.e., Bowen Tr., 7/22/02, at 177).

**11.** Plaintiff disputes whether certain individuals were "plaintiff's representatives," and/or

whether their knowledge/acts should be attributed to plaintiff. That issue is not relevant to this discussion, and the court uses the phrase, "plaintiff's representatives," for convenience only, without deciding the agency issue raised by plaintiff.

circumstances that it could comply, did you rely on anything said to you by [plaintiff's representatives] that you didn't check out yourself in so advising the Town that it could enter those agreements?

A. [By Mr. Bowen:] No, I checked everything in every way I could find possible.

[Bowen Tr., 7/19/02, at 194–196; Bowen Tr., 7/22/02, at 147.]

Second, not only have defendants failed to identify any evidence in the record that Bowen did rely, but there was substantial evidence that he did *not* rely. For example, defendants cite as supportive the following testimony of Bowen, emphasizing the underlined portion.

Q. [By Mr. Krowicki:] By the time June 29th, 1993 arrived, the date upon which the Supply Agreement was executed, can you tell the Court what the Town of Montville's view, through you, was in connection with its ability to supply treated water which complied with the Supply Agreement?

A. [By Mr. Bowen:] Based upon the lab testing that we had done, *and the comparisons*, we felt that the present effluent at the Treatment Plant could always meet the agreement.

[Bowen Tr., 7/22/02, at 146.] The town argues that the "comparisons" referred to are the statements made by plaintiff's rep-

resentatives that the effluent would be the same as or similar to that of the Robertson facility. The court, however, agrees with plaintiff that Bowen was not referring to any "comparison" between the old and new mills, but rather a "comparison" between the lab test results on the municipally treated water and the Supply Agreement requirements.

Bowen repeatedly testified that he always believed that the Town would be able to segregate the new Mill effluent from the municipal wastewater, and therefore that the municipal water being tested at the planning stage (containing the Robertson effluent) was the "worst" that the water would be. Thus, the "comparison" he made was between the current quality of the municipal water and the requirements imposed by the Supply Agreement. Although the defendants argue that "[t]his is an admission of reliance if there ever was one" [Def.s' Opp. Mem. at 56], given the proper and only reasonable interpretation of Bowen's testimony, it actually demonstrates non-reliance. Bowen did not believe and depend on plaintiff's representation of similarity and hope it proved correct; his plans were not dependent on any such expectation, and he prepared for the "worst case scenario." [12]

Bowen testified extensively about the plans for waste stream segregation, which he referred to as his "insurance policy." [Bowen Tr., 7/22/02 at 200–01.] He testi-

---

12. Bowen did not test the then-current water because he expected effluent from the new mill to replicate the discharge from the Robertson facility in quality or quantity. All parties agreed that the new mill would produce much more (but still an uncertain amount) of effluent. The tests did not take into account the additional *quantity* of water, and could not predict whether defendants would be able to comply. Rather, Bowen planned for segregation—where defendants would not be treating and returning plaintiff's water, but providing separate municipal water. [*See, e.g.,*

Bowen Tr., 7/22/02, at 145–46 ("I had always had the knowledge or the feeling that I could separate the two flows and I always had. The effluent of the plant was, at the present time, with the flows that were going through it, met the agreement. So, if I could separate off enough flow from the plant to send it back without the mixing of the new plant it wouldn't be a problem.").] The tests were therefore conducted to determine if that municipal water (*after* segregation) would be able to comply with the terms of the Supply Agreement.

fied that he "had always prepared for the possibility that the flows from the mill could not be sent back," about the segregation equipment he installed, and about segregation in general. [Bowen Tr., 7/22/02, at 189; *see also id.* at 97, 103–06, 145–56, 200–01.] Although the fact that Bowen prepared for an alternative scenario does not, in and of itself, prove non-reliance sufficient to entitle plaintiff to judgment as a matter of law, it is strong evidence that he did not rely. This evidence is especially compelling when combined with Bowen's explicit statements that he did not rely, and defendants' inability to point to any evidence demonstrating reliance.

Additionally, an overwhelming amount of evidence demonstrated that all parties were concerned with biochemical oxygen demand ("BOD") and total suspended solids ("TSS") in the water, but not TDS. First, Bowen testified that he did not "remember" whether TDS was ever discussed:

> Q. [By Mr. Krowicki:] . . . The similarity of the discharge between Robertson Mill and the proposed mill. Do you remember seeking information of that type from [plaintiff's representatives]?
>
> A. [By Mr. Bowen:] Yes, I did.
>
> Q. [By Mr. Krowicki:] What did they tell you?
>
> A. [By Mr. Bowen:] They told me it would be similar. That it's, you know, that they're paper mills. . .
>
> \* \* \* \* \* \*
>
> Q. [By Mr. Krowicki:] . . . What parameters were you looking for from [plaintiff's representatives] when you asked them about a similarity of the effluent discharge?

> A. [By Mr. Bowen:] I was looking for the BOD and suspended solids [i.e., TSS], again, to see how they were going to compare, you know, how many pounds are there going to be, what are we going to have to treat?
>
> Q. [By Mr. Krowicki:] Did the term TDS, or total dissolved solids, ever come up in the course of those conversations?
>
> A. [By Mr. Bowen:] I can't remember at this point.

[Bowen Tr., 7/22/02, at 141–42; *see also* Bowen Tr., 722/02, at 158 ("my concerns with the old mill were always BOD and suspended solids").] Bowen's testimony therefore corroborated the testimony of James Cobery, who worked for Rand–Whitney, that the parties' concerns in discussing the effluent were primarily BOD and TSS. [*See, e.g.,* Cobery Tr., 7/17/02, at 66, 70–71; Cobery Tr., 7/19/02, at 31–32.]

Bowen's statements about being concerned only with BOD and TSS are especially telling with respect to "the bucket, an incident emphasized by defendants." [13] Bowen had requested a sample of effluent from one of plaintiff's other paper mills, but, by the time the bucket was delivered to Bowen, it was septic, and could not be tested for what Bowen wanted to discover. Bowen testified that, because the bucket was septic, he could not test it for BOD or TSS:

> Q. [By Mr. Krowicki:] What parameters would you have tested the bucket for had it not been septic?
>
> A. [By Mr. Bowen:] For BOD and suspended solids [TSS].
>
> Q. [By Mr. Krowicki:] Would you have tested the bucket for total dissolved solids [TDS]?

---

13. Defendants placed great emphasis on "the bucket." The issue of *what* Bowen wanted to discover, however, is important with respect to the reliance element.

A. [By Mr. Bowen:] That was not something we were concerned with at treatability, no.

Bowen Tr., 7/22/02, at 145; *see also* Bowen Tr., 7/19/02, at 197; Bowen Tr., 7/22/02, at 181–82 ("the parameters I was concerned with were BOD and suspended solids because that's what I had to meet in my permit"). Indeed, on cross examination by defendants' counsel, Bowen testified that, if he had wanted to test the bucket for TDS, he still could have done so, even though the bucket was septic. [Bowen Tr., 7/22/02, at 184 ("We could have if that's what we were intending to look for, but that's not what we were looking for. We were looking for the BOD and suspendeds.").[14]]

This is important because of the nature of plaintiff's claim and defendants' defense and counterclaim. Rand–Whitney claimed that defendants breached the Supply Agreement by providing water with TDS levels higher than that Agreement allowed. Defendants' affirmative defense and parallel counterclaim was that Rand–Whitney misrepresented the nature of its future effluent, and that defendants could not comply with the TDS requirements in the Supply Agreement because of the unanticipated high TDS levels in plaintiff's ef-

fluent (which had to be treated and returned to plaintiff). The fact that Bowen was not concerned with TDS, and specifically chose not to test for TDS even though he had that capability, is fatal to defendants' reliance claim,[15] especially in light of the absence of any other evidence supporting that claim.

 Defendants reply that the jury was permitted to disregard Bowen's testimony. Of course, that is true, as a general matter. Defendants also argue that the jury's disbelief of Bowen may constitute affirmative evidence of reliance, the fact that he denied. In other words, defendants argue that the jury could have disbelieved Bowen's statement that he "did not rely," and found that to be evidence that he did rely. However, when disbelief of testimony is the *only* evidence of a fact, there is not enough evidence to go to a jury, and a court must grant judgment as a matter of law.

Whether disbelief of a denial is sufficient evidence, in and of itself, for a jury to find the opposite of what was denied is a question that has been answered in the negative by the Court of Appeals on several occasions.

---

14. Bowen's testimony here undermines defendants' interpretation of what Bowen meant when he stated that he did not rely. Plaintiff's counsel asked Bowen if he relied on plaintiff's statements without "checking it out" for himself. Bowen responded that he did not. [Bowen Tr., 7/19/02, at 194, 196.] Defendants argue that "[a] perfectly reasonable jury could have interpreted his response to mean that he checked out for himself what he *could* check out for himself, *and* that he relied on [plaintiff's] representations." [Def.s' Mem. in Opp. at 57 (emphasis in original).] However, Bowen specifically testified that he *could* have tested the bucket for TDS, and that he simply chose not to do so. This does not demonstrate that Bowen relied on (or "believed") plaintiff's representations; it demonstrates that he was unconcerned with

(and not "depending on") any statements about TDS. There was absolutely no evidence that Bowen chose not to test the bucket for TDS, despite the ability to do so, because he believed any representation about TDS; but there was direct testimony from the only person in the position to "rely" that he would never have tested for TDS because he was not concerned about TDS.

15. At issue is whether defendants have a legal "excuse" for breaching the TDS provisions of the Supply Agreement. Thus, even if defendants could show reliance on statements about BOD and TSS—which they have not done—that would not be relevant to the issues in this case.

In *Dyer v. MacDougall,* 201 F.2d 265, 268–69 (2d Cir.1952), Judge Learned Hand, writing for the court, recognized that a witness' "demeanor" is "a part of the evidence," and that a jury is not "confined to [words]" in reaching a verdict. The court also noted that:

such [demeanor] evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denied.

*Id.* at 269. The court then went on to hold:

Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegation in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him.

*Id.* See also *Goldhirsh Group Inc. v. Alpert,* 107 F.3d 105, 108–10 (2d Cir.1997) (disbelief of a witness' testimony is insufficient to support a verdict in the absence of other affirmative evidence; such verdict was based "not on legitimate inference, but on impermissible speculation")[16]; *United States v. Eisen,* 974 F.2d 246, 262 & n. 6 (2d Cir.1992) (recognizing, in the criminal context, the rule of law explained in *Dyer,* but finding that line of cases "inapposite because in [*Eisen* ] there was independent evidence to support [the matter denied]"); 29 Am.Jur.2d, Evidence § 164 ("[a] party cannot, however, sustain its burden of production by calling adverse or hostile witnesses, eliciting testimony that negates its cause of action, and then arguing that the jury could find for that party simply by disbelieving these witnesses").

Because there was no affirmative evidence of reliance, defendants could not, as a matter of law, have met their burden of proof based on the jury's disbelief of Bowen's denial of reliance.

■■■ Defendants also argue that the jury could have drawn an adverse inference regarding plaintiff's failure to call two

---

**16.** In *Goldhirsh,* the plaintiff's claim of defamation depended on proof that the allegedly defamatory statement was made. However, the *only* witness in the position to testify about whether the statement was made denied that it was made. Thus, *no* witness testified that the remark was made; and one witness testified that it was *not* made. Acknowledging that the jury "certainly had the right to disbelieve [the witness]," the court held that " '[i]f all of the witnesses deny that an event essential to the plaintiff's case occurred, the plaintiff cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred.' " *Goldhirsh,* 107 F.3d at 109 (quoting 9A Wright & Miller, *Federal Practice and Procedure* Civil 2d § 2527, at 288) (bracketed form in original; other citation omitted). The *Goldhirsh* court also relied on *Dyer* and *Bose Corp. v. Consum-* *ers Union of the United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) ("When the testimony of witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion"). Lastly, the court offered a "haunt[ing]" hypothetical question that can be applied to this case: "why did [the plaintiff] never call as a witness any one of the four persons to whom [the defendant] allegedly made disparaging statements?" *Goldhirsh,* 107 F.3d at 110. This court puts a similar question to defendants regarding their argument that Bowen's testimony was a "misleading answer to a question with an embedded modifier" [Def.s' Opp. at 56]: why did defendants not ask the question without the "obvious[ ] craft[ing]" or "embedded qualifier"?

witnesses. The court instructed the jury that it could, but was not required to, draw an adverse inference against any party that failed to call a witness that it was in the best position to produce.[17] Without getting into the propriety of that charge, which plaintiff challenges, the court holds that—like an inference based on disbelief—any inference based on a failure to call a witness cannot, as a matter of law, constitute clear, precise, and unequivocal evidence of reliance without some other, affirmative evidence of it. *See, e.g.,* 29 Am.Jur.2d, Evidence § 256 ("The unfavorable inference arising from the failure of a party to call available witnesses does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case; it does not relieve the other party from the burden of proving his case") (footnotes omitted); 2 McCormick on Evid., § 264 (5th ed.) ("unlike the usual presumption, [the uncalled witness presumption] is not directed to any specific presumed fact or facts which are required or permitted to be found; [t]he burden of producing evidence of a fact cannot be met by relying on this 'presumption' "). Because this "presumption" cannot make up for a total lack of evidence, it cannot constitute the evidence of "reliance" needed by defendants to survive plaintiff's motion for judgment.[18] Nor can two "inferences" (based on disbelief of Bowen's testimony, and based on a failure to call witnesses)—both of which require affirmative evidence to prove, and neither of which *is* affirmative evidence.

In sum, there was no evidence produced at trial that defendants relied on any Rand–Whitney representation regarding the characteristics of the new mill's effluent. Although Tom Bowen was the only person in a position to rely (in making his recommendation to town decision-makers), there is no evidence that he considered, let

---

**17.** The court's "uncalled witness" charge read as follows: "You have heard references in testimony and argument to people who were not called to testify during the trial. If you find that one party could have called a witness, and that that party was in the best position to produce him, and that the witness would have given important new testimony, then you are permitted, but not required, to infer that the testimony of that witness would have been unfavorable to the party who did not call the witness. In deciding whether to draw this inference, you should consider whether the testimony of the witness you are considering would merely have repeated other testimony and evidence already before you. You may also consider whether the party had a reason for not calling these witnesses which was explained to your satisfaction. Any inference you decide to draw should be based on all of the facts and circumstances in this case. If you find that any witness was equally available to both sides, you may infer that the testimony of the uncalled witness might have been unfavorable to Rand–Whitney or Montville or both. Alternatively, if a witness was unavailable to both Rand–Whitney and Montville, you may simply disregard his possible testimony as a factor in this case. You should, however, remember that there is no duty on either side to call a witness whose testimony would merely repeat or duplicate other evidence. You should also remember that, after it became obvious that this trial would exceed the time originally allocated, I encouraged counsel to try to shorten their presentations to the extent possible without prejudicing their cases. Again, your decision to draw or not to draw any inference about the absence of any particular witness should be based on all of the facts and circumstances in the case." [Jury Charge at 27–28.]

**18.** It is also questionable whether an uncalled witness presumption or inference can be applied to the reliance element of the fraud defense and counterclaim. Assuming, *arguendo,* that plaintiff's uncalled witnesses could have testified regarding certain relevant facts (i.e., whether the statements were made, what exactly was said, the "intent" of the statement), defendants have offered no theory under which either witness could have testified about whether *defendants* (or Bowen) relied. However, given its holding, the court need not specifically address that issue.

alone believed, any Rand–Whitney statement about TDS in the new mill effluent or that he depended on the truth of any such statement in recommending that the town enter the Supply Agreement.[19] On contrary, there is direct evidence, his testimony, that he did *not* rely.

Because there is a complete absence of evidence supporting the jury's finding that Bowen relied, and direct evidence that Bowen did not rely, on plaintiff's representations regarding the quality of the future effluent, the court enters judgment in favor of plaintiff on defendants' fraud defense and counterclaim.

### B. *Defendants' Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing*

In challenging the jury's conclusion that Rand–Whitney breached the covenant of good faith and fair dealing (the "Covenant Counterclaim"), Rand–Whitney argues two alternative theories. The first is that plaintiff is entitled to a new trial on the Covenant Counterclaim because the court failed to properly instruct the jury regarding the covenant of good faith and fair dealing. [Pl.'s Mem. at 47.] The second is that Rand–Whitney is entitled to judgment as a matter of law on the Covenant Counterclaim because the Montville defendants failed to prove a breach by a preponderance of the evidence and/or the Covenant Counterclaim was insufficiently pleaded. [Pl.'s Mem. at 54.] The court will address each argument in turn.

### 1. *The Court Properly Instructed the Jury*

Rand–Whitney assigns two errors in the court's instruction on the Covenant Counterclaim: (1) the supposed failure to instruct that the implied covenant may only arise from an explicit contractual provision; and (2) the court's injection of a "negligence standard".

 First, Rand–Whitney argues that "the court's instruction allowed the jury to imply a duty of disclosure and a duty to negotiate absent the existence of any express terms imposing those duties." [Pl.'s Mem. at 51 (quoting portions of the instruction which characterized defendants' *allegations* ).] Plaintiff claims that the court erred because the jury was not instructed that an implied covenant of good faith and fair dealing "had to arise from express terms in one of [the] agreements." [Pl.'s Mem. at 52.] Specifically, plaintiff disputes the court's charge that:

> The covenant of good faith and fair dealing does not apply prior to the formation of a contract, and thus normally does not apply to negotiations. However, when the negotiation is for the modification of an existing contractual relationship, general principles of law may[20] require that the party negotiate those modifications in good faith.

[Pl.'s Mem. at 52–53 (quoting Jury Charge at 85).]

**19.** Although the parties briefed numerous issues, including every element of the fraud defense and counterclaim, this ruling is based only on the absence of evidence of reliance. So, for example, although defendants spent a great deal of time discussing how certain inferences may form the basis of the jury's belief that plaintiff "knew the statement to be false," or that plaintiff had the "intent to induce," this ruling does not address those issues. This decision focuses on *defendants'* state of mind, not plaintiff's state of mind. Regardless of whether there is evidence that plaintiff intended to induce reliance, or whether the jury could infer that intent from the statement made, there is no affirmative evidence that defendants (through Bowen) *did* rely.

**20.** Plaintiff's specific attack on the court's use of the word "may" is addressed subsequently.

The jury was instructed that the covenant of good faith and fair dealing exists in every contract as a matter of law, that the jury therefore need not decide whether the covenant was implied in the contract in this case, and that the general breach of contract standard applied. [Jury Charge at 83–84.] The court had already instructed the jury that, to prove a breach of contract, one must show, by a preponderance of the evidence: (1) the existence of a contract; (2) a breach of that contract; and (3) damages. [Jury Charge at 29.] The jury was instructed on ascertaining a party's intent, construing written documents, ambiguity, multiple writings, parol evidence, integration clauses (and their applicability), and construing terms against the interest of the party that drafted the contract. [Jury Charge at 29–34.] In sum, the jury was instructed that, although the covenant was undoubtedly implied in the Supply and Treatment Agreements, as in every other contract, the jury would have to determine whether each provision alleged by defendants not to have been executed in good faith implicated and breached that covenant, causing at least some damages[21] to defendants. The jury was specifically instructed that "the concept [of the covenant of good faith and fair dealing] is designed to fulfill the reasonable expectations of the parties as they presumably intended" [Jury Charge at 84], that "intent is determined from the language used in the agreement, and in light of the surrounding circumstances, and in light of the motives of the parties and the purposes which they sought to accomplish," and that "intent ... is ... ascertained by a fair and reasonable construction of the written words." [Jury Charge at 30.]

The jury was also instructed that "[b]ad faith implies a design to mislead or deceive another or the neglect or refusal to fulfill a *contractual obligation* not prompted by an honest mistake as to one's rights or duties." [Jury Charge at 84 (emphasis added).] The court further explained that it was "a rule of construction, applying to all contracts," and that it "cannot be applied to achieve a result contrary to the clearly expressed terms of a contract." [Jury Charge at 85.][22]

The court did not charge that the implied covenant existed in any particular provision, but rather left it for the jury to determine whether the covenant applied "at the time of and to any dealings" that they found were done in bad faith.[23] [Jury Charge at 87.] The court instructed the jury that it was permitted, but was not required, to find that the covenant applied (and that the parties were required to negotiate modifications in good faith), based on their "factual determination about the actual nature of [the parties'] relationship." [Jury Charge at 87.]

21. Again, defendants' damages claim was severed.

22. Plaintiff's argument that the instruction "was erroneous because it failed properly to explain that any claimed duty of disclosure or duty to negotiate in good faith must arise from an express term to that effect" is flawed because it fails to look at the charge as a whole. *See, e.g., Kelber v. Joint Industry Bd. of Elec. Industry*, 27 F.3d 42, 46 (2d Cir.1994) (jury charge must viewed "as a whole"). Although the court did not use the exact words plaintiff suggests in its post-trial brief, it did instruct the jury that, in determining whether a duty to negotiate in good faith existed, it must look to the parties' intent, which is largely dependent on the specific terms used in the contract. The court does not believe that the inclusion of a middle step was error or confused the jury.

23. The court explained that the jury first had to find that plaintiff negotiated in bad faith. [Jury Charge at 86–87.]

These instructions, viewed as a whole, were a correct explanation of the law. The court explained to the jury the general rule that the covenant does not apply to negotiations, and that, "[i]f the parties were negotiating a new agreement rather than renegotiating the existing one, the covenant would not apply." [Jury Charge at 87.] However, the covenant may apply to renegotiations in an existing contractual relationship. *See, e.g.,* Restatement (Second) Contracts § 205, cmt. c (explaining that the covenant of good faith and fair dealing does not apply to negotiations of a new contract, but noting that, "[i]n cases of negotiation for modification of an existing contractual relationship," the covenant is applicable, and may even "overlap with more specific rules requiring negotiation in good faith"). *See also Warner v. Konover,* 210 Conn. 150, 154, 553 A.2d 1138, 1140 (Conn.1989) (where the Connecticut Supreme Court noted that it has "relied squarely on § 205 ... of the Restatement (Second) of Contracts" in interpreting the covenant of good faith and fair dealing) (citing *Central New Haven Development Corporation v. La Crepe, Inc.,* 177 Conn. 212, 217, 413 A.2d 840 (1979)). It was not error to instruct the jury that the covenant "may" exist regarding the negotiation of modifications in this case.

Plaintiff apparently assigns error in the court's failure to identify a specific provision to which the jury should look, because, as a matter of law, no provision in either the Supply or Treatment Agreement specifically imposed a duty of good faith and fair dealing on the renegotiations at issue in this case. The court disagrees.

The parties admitted hundreds of pages of exhibits for the jury's consideration. Among those exhibits were the 1993 Supply and Treatment Agreements [Exs. 27 & 28], the original 1992 Supply Agreement [Ex. 723], and drafts of these and other agreements [*e.g.,* Ex. 525 (portions of the 10/5/92 Supply Agreement)]. No agreement unambiguously *disclaimed* a duty to negotiate modifications in good faith. Accordingly, the court left to the jury the question of whether a duty existed.

The court cannot hold that there was no evidence on which the jury could have based a finding of the existence of the covenant, applicable to the renegotiations at issue. For example, the jury had before it the original 1992 Supply Agreement [Ex. 723]. That agreement provided, among other things, that "[t]he Town shall enter into such additional agreements with Rand–Whitney relating to delivery systems, easements and other matters as may be necessary in the judgment of Rand–Whitney to carry out the purposes of this Agreement" [Ex. 723 at p.2, ¶ 2], and that the terms of the 1992 Agreement could be amended or waived by agreement of the parties in writing [*id.* at p.2, ¶ 4]. The court cannot hold that, as a matter of law, neither the provision requiring the negotiation of additional agreements nor the provision permitting amendments to that agreement carried with it the duty to negotiate those matters in good faith.[24]

The court instructed the jury that the burden was on defendants to prove, by a preponderance of the evidence, that the covenant applied, that plaintiff breached it, and that defendants were damaged by the breach. This instruction—which left the

24. Although the court addresses this issue in the context of the propriety of the charge, the discussion also disposes of Rand–Whitney's argument that defendants failed to prove a breach of the covenant because there is no term in the 1992 agreement that imposed on plaintiff any duty of disclosure or duty to negotiate modifications. [*See* Pl.'s Mem. at 55–58.]

interpretation of ambiguous contract language to the finder of fact—was not error.

■ Second, plaintiff argues that the court "erroneously injected a negligence standard into the covenant in a way that could only have confused the jury as to what it was required to find." [Pl.'s Mem. at 53.] The court rejects this argument for two reasons.

■ First, viewing the charge as a whole,[25] the court is confident that the jury was not confused about what it was required to find. Plaintiff has cited no case holding that use of the phrase "reasonable care" in an instruction on the covenant of good faith and fair dealing is erroneous, *per se,* and has not argued why that term is improper with respect to the specific allegations made by defendants in this case.[26] Indeed, it is clearly the law, and undisputed, that "bad faith" in this context may mean *"neglect* or refusal to fulfill a duty or contractual obligation not prompted by an honest mistake as to one's rights or duties," *Foley v. Huntington Co.,* 42 Conn.App. 712, 727, 682 A.2d 1026, 1037 (Conn.App.1996) (emphasis added)[27]—a definition which contains negligence-like terms. The law that plaintiff cites in its post-trial brief is that " 'bad faith . . . means more than mere negligence; it involves a dishonest purpose.' " [Pl.'s Mem. at 53 (quoting *Barber v. Jacobs,* 58 Conn. App. 330, 338, 753 A.2d 430, 435 (2000)).] The court not only agrees with plaintiff, but it specifically instructed the jury on that point, quoting *plaintiff's* proposed instruction. [Jury Charge at 84 ("[b]ad faith

is not simply bad judgment or negligence, but implies the conscious doing of a wrong because of a dishonest purpose").]

Plaintiff relies on the court's use of the phrase "reasonable care" twice in its instruction. Reading the charge as a whole, however, and not selectively quoting certain portions, the court finds that it was not confusing to the jury. The court's first use of the "reasonable care" phrase was in the context of characterizing defendants' allegations:

> Montville alleges that once Rand–Whitney and Montville entered into their first contract, Rand–Whitney owed a duty of disclosure to the Town, and was required to exercise reasonable care in supplying material information to the Town during their subsequent dealings.

[Jury Charge at 85.] The second time the court mentioned the term, the court did so while reminding the jury of the appropriate standard:

> The burden is on Montville to prove, by a preponderance of the evidence, that the covenant applied and that Rand–Whitney breached it. First, you must determine whether, beginning on or after June 1, 1992, someone acting on behalf of Rand–Whitney *dealt with Montville in bad faith* during the negotiations leading to the June 29, 1993 agreements. You will decide whether Rand–Whitney exercised reasonable care in responding to inquiries about the nature of the future discharge from the mill. You will have to determine what

---

**25.** *See, supra,* note 22 (citing *Kelber v. Joint Industry Bd. of Elec. Industry,* 27 F.3d 42, 46 (2d Cir.1994) for the proposition that the jury charge must viewed "as a whole").

**26.** *Cf. Dubinsky v. Citicorp Mortg., Inc.,* 48 Conn.App. 52, 58, 708 A.2d 226, 230 (1998) (expressing some skepticism "that the implied covenant of good faith and fair dealing can be

used to incorporate a negligence concept, i.e., duty, into the plaintiff's breach of contract claim," but assuming, *arguendo,* that it was correct).

**27.** Plaintiff specifically requested this instruction. [Pl.'s Proposed Jury Instr. re Implied Covenant of Good Faith and Fair Dealing (doc. # 241) at 1.]

material requests were made, to whom, and for what reason, including to which contract or issues the requests related. Then you will determine whether anyone acting on behalf of Rand–Whitney responded *in bad faith, as I have explained that term to you.*[28]

[Jury Charge at 86–87.]

A central point argued by Rand–Whitney to the jury was that the statements of its representatives regarding likely similarity were reasonably believed by the speakers (and even accurate). The court was informing the jury that, if it found that Rand–Whitney acted reasonably (i.e., with reasonable care) in supplying information/statements to defendants, then the jury should not find that plaintiff acted in "bad faith." The court did not instruct the jury that a failure to exercise reasonable care *was* bad faith, *per se.* Viewed as a whole, with the detailed explanation of bad faith adopted from plaintiff's proposed instruction, the charge was not confusing to the jury.[29]

■ Moreover, the court rejects plaintiff's argument because plaintiff did not object to the charge on these grounds after it was delivered to the jury. At oral argument, plaintiff's counsel conceded that plaintiff did not raise its "failure to plead" objection, but argued that the court injected the negligence standard over explicit objections. As the court reads the record—and neither party has identified the relevant portions of this voluminous record—plaintiff preserved neither objection. Plaintiff objected as follows:

[Mr. Goldberg:] With respect to the covenant of good faith and fair dealing, Your Honor did identify into the charge that it was with reference to the June 1992 agreement, but the lead into that charge still referred to good faith and fair dealing inherent in the supply and treatment agreements, which is broad enough, obviously, to cover the June '93 agreements, as to which it has been identified there is no good faith and fair dealing claim that has been asserted, and that is particularly an issue because the Court did not include the instruction that arises from the statement in Your Honor's summary judgment decision, to the effect that the supply agreement did not impose an obligation on Rand–Whitney to know or to identify what its discharge would be. That same instruction, we believe, should have been given with respect to any of the supply agreements, and therefore, should be built into this instruction.

We also object to the concept of good faith and fair dealing being applied, as this instruction does, to the issue or renegotiation of either of the agreements, as opposed to performance of either of the agreements.

[Tr., 8/7/02 (doc. # 264) at 11–12.] Plaintiff's failure to object to this aspect of the charge is additional grounds for rejecting plaintiff's argument that the charge was erroneous.

---

28. The court had already defined "bad faith" as a "design to mislead or deceive another or the neglect or refusal to fulfill a contractual obligation ... Bad faith is not simply bad judgment or negligence, but implies the conscious doing of a wrong because of a dishonest purpose. It contemplates a state of mind affirmatively operating with bad design or ill will." [Jury Charge at 84–85.]

29. In other words, even if including the phrase "reasonable care" were improper—which plaintiff has not shown, especially in light of the "neglect" standard that plaintiff correctly proposed—the court holds that the charge as a whole properly instructed the jury on the definitions of "good faith" and "bad faith" and the standard it should apply.

### 2. Defendants Offered Sufficient Evidence from which the Jury Could Have Found a Breach of the Covenant

Rand–Whitney articulates four theories under which the evidence was insufficient to support the jury's verdict on the Covenant Counterclaim: (1) that defendants failed to prove a breach of the covenant by a preponderance of the evidence; (2) that no term in the June 1992 agreement imposed any duty of disclosure or duty to negotiate modifications in good faith; (3) that defendants failed to prove the "fact of damages"; and (4) that no surviving count pleaded such a claim. [Pl.'s Mem. at 54–61.] The court has already disposed of the second and third theories [see, supra, note 24 (and accompanying text) and note 5, respectively], and will take up the fourth theory in the following section [see, infra, section IV.B.3]. Accordingly, the court addresses only the first argument—the general absence of evidence—in this section.

■ Plaintiff's motion for judgment and supporting memorandum discusses the first theory in one paragraph, but incorporates argument from section I.A of its memorandum.[30] Plaintiff argues that, "[o]n this intent element, the jury's finding would be essentially the same as that required for fraud," and that, "[u]nder the same analysis as was made in *Part I.A* there also is no evidence to support a finding of bad faith under the covenant

instruction quoted above." [Pl.'s Mem. at 55.] Plaintiff argues that "[t]his is so even at the lower preponderance standard because the evidence failed to showed [sic] any falsity, much less a false intent, by [plaintiff] in its disclosures about the effluent." [Id.] In other words, plaintiff argues that defendants failed to prove a breach of the covenant for the very same reasons they failed to prove fraudulent intent. [Id.]

The court does not agree that the issues are identical. On defendants' Covenant Counterclaim, the jury was required to find that an implied covenant to disclose or negotiate in good faith *applied* at the time of and with respect to the negotiations leading to the 1993 Supply and Treatment Agreement,[31] that plaintiff *breached* that covenant by negotiating modifications in bad faith, and that defendants suffered at least some *damages*. As Rand–Whitney itself pointed out in its proposed jury instruction, "[b]ad faith implies a design to mislead or deceive another or the neglect or refusal to fulfill a contractual obligation not prompted by an honest mistake as to one's rights or duties." [Doc. # 242 at 1 (quoting *Foley v. Huntington Co.*, 42 Conn.App. 712, 726 n. 6, 682 A.2d 1026 (1996)).] Accordingly, the verdict was lawful if, for example, the jury found that the contract required frank disclosure of information (if relevant provisions of that contract were renegotiated)[32], and that, in

---

30. In section I.A., plaintiff argued that defendants failed to prove their fraud defense and counterclaim because there was no evidence that the statements as to the similarity of the effluent were false, and no evidence that the statements were made without a good faith belief in their truth. [Pl.'s Mem. at 6–13.]

31. Although plaintiff argues that the duty to negotiate in good faith may arise only from an explicit provision requiring negotiation in good faith, the court finds that argument to be necessarily inconsistent with the concept of

an "implied" covenant, such as an implied covenant to negotiate modifications in good faith, which the Restatement recognizes. *See* Restatement (Second) Contracts § 205.

32. In other words, the jury could have found that the parties intended, in drafting the provision providing for written modifications, that such modifications be negotiated in good faith, and that, by "good faith," the parties intended frank disclosure of (or candor regarding) any information relevant to those modifications.

negotiating modifications to the contract, plaintiff neglected or refused to disclose relevant information, and that neglect or refusal was not prompted by an honest mistake as to its contractual duty.[33]

Such a finding, if made, would be legally distinct from a finding that plaintiff made an affirmative misrepresentation, with intent to deceive, regarding a belief that it did not in good faith entertain. Although Rand–Whitney attempts to equate the two in its postjudgment memorandum, it has repeatedly distinguished similar theories in arguing, for example, that defendants should not be able to present to the jury theories grounded in a "failure to disclose" rather than intentional misrepresentation. [See, e.g., Pl.'s Obj. to Def.s' Mot. for Leave to File Am. Answer, Affirmative Defenses and Countercl. (doc. # 142) at 5

("Concealment, or failure to disclose, is clearly not actionable [under the court's prior rulings]").] The court does not agree that the reasoning advanced by Rand–Whitney regarding fraudulent intent applies equally to the Covenant Counterclaim. Plaintiff has not met its heavy burden of demonstrating that it is entitled to judgment as a matter of law or a new trial on this counterclaim.[34]

There is a second and independent reason for rejecting plaintiff's argument that defendants failed to prove a breach of the covenant: Rand–Whitney did not raise this argument in its motion for directed verdict. [See doc. # 243.] Although Rand–Whitney argues that it was not aware that "defendants' pleadings … raise[d] any claim asserting breach of the

33. Rand–Whitney has, at times, pointed to this court's ruling on summary judgment, where the court noted, in the context of discussing defendants' "mutual mistake" defense, that "no term of the Supply Agreement imposed on plaintiff the responsibility to determine for defendants what the characteristics of the new mill's effluent would be, whether defendants' facilities were capable of delivering the promised water, or how defendants should design their facilities in order to deliver that water." [Doc. # 106 at 19.] However, it is one thing to say that no express term required plaintiff to discover certain information, and another to say that "good faith" requires disclosure of information actually and already known (whatever that information may be) when renegotiating terms on which that information would be relevant and important. The jury apparently found that failure to disclose the latter was not in "good faith," a finding not necessarily inconsistent with prior decisions of this court.

34. In light of the lesser burden of proof and different elements, the Covenant Counterclaim can be supported by sufficient evidence even though the fraud claim is not. The court did not have to decide whether there was sufficient evidence of fraudulent *intent* because there was no evidence of reliance. However, the court notes, by way of example,

that there was evidence that plaintiff had an ownership/control role in other paper mills, that representatives of plaintiff speculated about a "$50,000 question" [Ex. 517] relating to the potential impact of the new mill on water quality, and that dissolved solids were identified to the DEP early [e.g., Ex. 520], all facts which may have contributed to a jury finding that plaintiff had information relevant to the renegotiation that was not disclosed, and that the failure to disclose was not "in good faith" or "fair dealing." (Of course, defendants would also be required to prove damages *caused* by this breach of the covenant.) In any event, the court holds that plaintiff has not met its burden on this motion by simply relying on its fraud argument. Although in its reply brief plaintiff disputes the characterization and/or import of some of the evidence raised by defendants in opposition to plaintiff's motion, the court is not persuaded. The Covenant Counterclaim was fact-intensive, requiring an evaluation of a great deal of documentary and testimonial evidence. The court cannot hold that the jury's verdict was reached through sheer surmise or conjecture, or that there was such overwhelming evidence to the contrary that the verdict was unreasonable and unfair. Nor is the court convinced that the jury reached a seriously erroneous result; thus it will not exercise its discretion to award a new trial on this issue.

1992 agreement" until it "was raised for the first time in the proposed jury charge that defendants filed at the close of trial on August 5" [Pl.'s Mem. at 60], Rand–Whitney's motion for directed verdict was filed on (and dated) August 6, 2002 [doc. # 243]. Indeed, plaintiff filed its Proposed Jury Instructions Regarding the Implied Covenant of Good Faith and Fair Dealing [doc. # 242] the same day that it filed the motion for directed verdict. Clearly, Rand–Whitney was aware of the issue, and its presentation to the jury, on August 6, 2002—the date it filed its motion for directed verdict. Accordingly, Rand–Whitney could have addressed the Covenant Counterclaim in its motion. [*See also, infra*, note 38 (finding no significant distinction between "claims arising under the 1992 agreement" and "claims arising under the 1993 agreement").] [35] Because this issue was not asserted in the motion for directed verdict, it cannot be raised in a postverdict motion for judgment. *See, e.g., Kutner*, 868 F.2d at 617 (a post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion); *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 WL 359462,

*3 (S.D.N.Y. Feb.18, 2003) ("a party may only make a post-judgment Rule 50(b) motion based on grounds that he specifically raised at the close of evidence") (citing *Lambert*, 10 F.3d at 53–54); 9A Wright & Miller, Fed. Prac. & Proc. Civ.2d § 2537 ("Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, it cannot assert a ground that was not included in the earlier motion").

### 3. Defendants Sufficiently Pleaded Their Counterclaim of Breach of the Covenant of Good Faith and Fair Dealing

 Rand–Whitney's motion is denied to the extent it claims that the Covenant Counterclaim was insufficiently pleaded. This issue was already decided in the court's Trial Order, issued July 15, 2002 (before the trial started). [Trial Order (doc. # 204) at 2–3 (holding, *inter alia*, that defendants' Covenant Counterclaim was one of "the causes of action fairly presented by the complaint and the counterclaims").] [36] That decision is the law of

35. Although plaintiff argues that the Covenant Counterclaim was not sufficiently raised despite being included ·in the Trial Order as a triable issue, plaintiff argues that its own ratification defense was sufficiently raised, or at least "tried with defendants' implied consent," in part because "the Trial Order identified ratification ... as an issue to be tried ...," and further argues that defendants can therefore " 'claim no surprise' " because they " 'were fairly warned that this claim was being presented' " [Pl.'s Post–Hearing Submission at 4 (quoting 6A Charles A. Wright, Arhtur R. Miller & Mary Kay Kane § 1493).]

36. In the Trial Order, the court noted that "[i]nclusion of issues in this order does not represent a finding that these issues will necessarily present jury questions at the conclusion of the evidence and is without prejudice to either party's moving for judgment as a

matter of law." [Trial Order at 1.] The court did not mean that, despite its careful decision about which issues were fairly pleaded, the parties were free to argue differently in a postjudgment motion. Rather, the court held that, although those issues would be presented to the jury, the parties would not be foreclosed from arguing that there was insufficient evidence to present a jury question—as plaintiff has argued with respect to both the fraud claim (successfully) and Covenant Counterclaim (unsuccessfully). The Trial Order was necessary because the parties have repeatedly attempted to re-litigate decided issues (typically arguing over what exactly was decided), and to enlarge the scope of triable issues. [*See, e.g.*, Trial Order at 1–2] ("The Court will not permit the parties to litigate the entire relationship of Rand–Whitney and the Town, or to ask the jury to undo a decade of interaction.... This case will ... be tried on

the case, and the court finds no grounds to disturb it. Moreover, this point was not raised in plaintiff's motion for directed verdict, and is therefore waived. *See Kutner,* 868 F.2d at 617; *Kuper,* 2003 WL 359462 at \*3; *Lambert,* 10 F.3d at 53–54.[37] Finally, plaintiff did not object to the inclusion of defendants' Covenant Counterclaim in the Jury Charge. [*See, supra,* page 34.][38] Therefore, because including the Covenant Counterclaim in the Jury Charge clearly did not constitute "plain error," plaintiff waived any objection.[39]

### C. *Remaining Proceedings*

In light of the court's holding granting judgment as a matter of law in favor of Rand–Whitney on defendants' fraud defense and counterclaim, this case must be retried to a jury. Because of the nature of the jury verdict, defendants have several defenses to damages on which there were no jury findings. [*See* Jury Interrogatories (doc. # 248) at ¶¶ 5–14.] The issue of plaintiff's damages, and defendants' defenses to damages, must therefore be tried to another jury.[40] There will be limited discovery *only* on defendants' damages. The July 15 Trial Order remains in effect, except as altered by this ruling (e.g., with respect to the fraud defense and counterclaim). The jury will decide what damages are fairly attributed to the *claims already proven* (and as *already pleaded*), subject to the various defenses and setoffs already delineated in the Trial Order, Jury Charge, and Jury Interrogatories. Before any motion is filed, the party intending to file that motion will contact the court for a pre-motion telephone conference. Any motion to exceed the page limit on an approved filing must be made in advance of the filing itself, and not contemporaneously.[41]

the causes of action fairly presented by the complaint and the counterclaims ..."). The parties were well-aware that the Trial Order was intended to be the final word on what issues were sufficiently pleaded and triable to the jury.

**37.** Any claim that plaintiff was not aware of nature of defendants' claim at that point is unavailing, given the July 15 Trial Order.

**38.** Plaintiff attempts to draw a distinction between the 1992 and 1993 versions of the Supply Agreement—apparently arguing that, although plaintiff may have been aware of a claim under the 1993 agreement, it was not aware of a claim under the 1992 agreement. The parties were aware, however, that defendants claimed that the duty existed when the parties negotiated amendments to the first agreement (thus *creating* the second agreement). Indeed, plaintiff argued that the law did not apply to the negotiations of amendments. [*See* Tr., 8/7/02 (doc. .# 264) at 11–12.] Thus, plaintiff did not misunderstand the nature of defendants' allegations. Moreover, the claim relates to *amendments* to the *same agreement*. (The 1993 Supply Agreement's actual title is: "Second Amended and Restated Water Supply Agreement ... Dated as of June 1, 1992, amended and restated as of January 4, 1993, further amended and restated as of June 29, 1993.") Claims regarding amendments necessarily involve prior versions. Even if plaintiff's objection were properly preserved, defendants' counterclaim was sufficiently pleaded under the liberal standards of Fed.R.Civ.P. 8(a),(e),(f).

**39.** Plaintiff's failure to object to the charge precludes any challenge to the substance of the instruction, but may not preclude challenge to the sufficiency of the evidence (if preserved under Rule 50). *See Wolf v. Yamin,* 295 F.3d 303, 308 (2d Cir.2002).

**40.** In this respect, the status of the case is now similar to what would have occurred had the court granted summary judgment to plaintiff on liability before trial, without "leaving open" defendants' fraud defense to liability.

**41.** The parties have repeatedly filed lengthy memoranda simultaneously with motions to exceed the page limit, as well as other submissions not contemplated by the rules. For example, including plaintiff's motion for judg-

## V. REMAINING COURT ISSUES

In the July 15 Trial Order, the court noted that four issues would be reserved to the court:

(1) plaintiff's claim for a declaratory judgment that defendants breached the Supply Agreement Sec. 8.3(e) by failing to provide plaintiff with notice of the effluent treatment request from Mohegan Sun;

(2) plaintiff's request for relief from the obligation to make future payments under the Order Approving Tentative Settlement, based on the claim that defendants breached the Tentative Settlement by failing to install the heat exchanger pursuant to contract;

(3) plaintiff's claim for a declaratory judgment that defendants breached Sec. 8.1 of the Treatment Agreement by failing to provide plaintiff with required BOD capacity reports;

(4) Defendants' claim that the Supply and Treatment Agreements be reformed.

[See Trial Order (doc. # 204) at 6.]

With respect to Issues 1 and 3, the parties will, within thirty (30) days of the docketing of this ruling, simultaneously submit briefs—*not to exceed five pages in length*—identifying their positions on these Issues, and citing[42] the portion(s) of the record each believes substantiates its position. No responses or replies will be accepted without prior permission from the court.

The court previously reserved decision on Issue 2 until after the jury trial. [*See* Ruling (doc. # 106) at 56–57.][43] The jury found, as a factual matter, that plaintiff failed to prove "that there was not 'satisfactory installation' of the heat exchanger within the meaning of the Standstill Agreement." [Jury Interrogatories (doc. # 248) at ¶ 18.] Accordingly, with respect to Issue 2, plaintiff's request is **DENIED**.

With respect to Issue 4, defendants' request appears to be moot, in light of the court's ruling on defendants' fraud defense and counterclaim. The court reserves decision on this issue, however, until defendants' damages case is presented to a jury. After evidence, the court will hear oral argument on whether there are grounds for reformation based on defendants' Covenant Counterclaim.

## VI. APPEAL

In light of the age of this case, the length of the trial in 2002, and the likeli-

---

ment and memorandum, defendants' objection and memorandum, the reply, the surreply, the opposition to surreply, plaintiff's "post-hearing submission," defendants' response to post-hearing submission, and other supplemental documents, the parties have filed over 200 pages of argument, not including the hundreds (or thousands) of pages of attachments and appendices. Although the court has indulged the parties's requests until now (perhaps because of the excellent counsel involved, as well as the importance of the case to all parties), there must be some limitations on briefing (and time spent on oral argument) if this matter is ever to be finally resolved.

42. The parties should attach copies of only those pages of the record referenced in the memorandum. They need not attach entire transcripts or exhibits.

43. There, the court held: " . . . the Standstill Agreement explicitly makes plaintiff's payment obligation 'subject to satisfactory installation of the heat exchanger . . .' [Mot. Discharge, Ex. B at ¶ 2.] Although defendants' general failures under the settlement agreement do not excuse plaintiff's bond obligations, plaintiff may be excused if the heat exchanger were not installed pursuant to contract. However, the court cannot make a finding of the adequacy of the installation at this point. Accordingly, plaintiff's motion, to the extent it relies on defendants' failure to adequately install the heat exchanger, is **DENIED WITHOUT PREJUDICE**. Plaintiff may, if it wishes, raise this issue at trial."

hood that this litigation will continue at the district court level, in some form, for a significant period of time, the court will entertain argument on the desirability and propriety of an interlocutory appeal to the Court of Appeals. *See, e.g.,* 28 U.S.C. § 1292(b) (allowing appeals, in rare cases, where the district court's decision involves controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal from the order may "materially advance the ultimate termination of the litigation"). To the extent the parties take a position on this issue, each should submit a memorandum regarding possible appeal within fifteen (15) days of the docketing of this decision. The memorandum should be limited to ten (10) pages, and no responses or replies will be permitted without advance permission. The memorandum should describe the party's position, briefly state the legal grounds on which appeal would be permitted (including identifying any controlling questions of law as to which there is substantial ground for difference of opinion), and cite any relevant case law supporting the party's position.

## VII. *CONCLUSION*

For the reasons stated in this decision, plaintiff's motion for judgment [doc. # 299–1] is **GRANTED IN PART** and **DENIED IN PART**; and plaintiff's motion, in the alternative, for a new trial [doc. # 299–2] is **DENIED**. Within fifteen (15) days of the docketing of this decision, the parties should contact the court to schedule a telephone status conference.

This is a case that continues to cry out for a negotiated settlement. The parties have committed tremendous resources to the litigation to date, for an outcome that provides no clear-cut resolution. They should heed the wisdom of the dedicated and diligent jury—finding that there were

wrongs committed on both sides—and make fresh attempts to define a relationship through which they can work together in the future. The parties are directed to contact Judge Garfinkel within thirty (30) days of the docketing of this ruling to discuss with him whether and on what terms further settlement discussions might be productive.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [doc. # 20] on July 30, 1996, with appeal to the Court of Appeals.